**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Della Marie PRATER, Defendant-Appellant.**

**No. 74–1962.**

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1975.

Decided July 3, 1975.

Michael B. Constance, Belleville, Ill., for defendant-appellant.

Henry A. Schwarz, U. S. Atty., Joel V. Merkel, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This is an unusual situation where one of two women employed to perform a strip tease act at a stag party wound up as a Mann Act defendant after the other woman engaged in oral sex with some of the male partygoers.

I

On March 21, 1974, 70 to 80 men paid $10 a person to attend a party held in the Firemen's Hall by the Firemen's Association of Washington Park, Illinois, a suburb of East St. Louis, to commemorate the impending marriage of one of its members. The president of the association, Charles B. Schreiber, personally arranged for four girls to attend the party to perform a strip tease act. They arrived when the party began at 7:30 or 8:00 p. m. All four performed their strip tease acts and left between 9:30 and 10:30 o'clock. As a finale, however, one of the four "performed an act of sexual intercourse with . . . a male individual who was attending the party" as part of the public entertainment.

In planning the party, Schreiber had been concerned that the quartet of strippers might not show up and so he called upon John Sirko, an East St. Louis beer distributor, to arrange for a "backup" strip tease show. On the afternoon of the party, Sirko telephoned a St. Louis, Missouri, number and reached Vivian Deering, who turned the telephone over to the defendant, Della Marie Prater. Sirko asked the defendant if she was interested in performing a strip tease at a stag show.

As a result of the telephone conversation, the defendant drove her automobile with Vivian Deering as a passenger from St. Louis to a restaurant in Illinois where they met Sirko at about 7:30 or 8:00 p. m. Using their own cars, defendant followed Sirko to the Firemen's Hall, arriving at about 10:30 and leaving between 11:00 and 12:00.

During their presence at the party, the defendant and Deering were observed by two witnesses, William Hopkins, a deputy sheriff for St. Clair County, and Fred Davis, a special agent for the FBI, as well as by Schreiber. In regard to the defendant, Schreiber testified that "[s]he just mainly walked around and talked to a couple of gentlemen there, and I think had a couple of drinks." As to Deering, he saw her go off into a side room with other persons at the party on two occasions.

Hopkins said both women permitted the men present to put their hands in their blouses, that the defendant offered him a party for $20 if he ever wanted to telephone her, and that he went outside and looked in the window to observe Deering performing oral sex on a man. He did not see the defendant perform any sexual act.

Davis said both women "engaged in what I would call heavy sexual petting" and "[b]oth partially removed their clothing." As to the defendant, he saw her sitting on a table talking to four or five males, giving out her telephone number and talking with them about making dates. He observed Deering committing two acts of "sexual intercourse" with two different males.

Deering testified that the defendant drove her from Missouri to Illinois and that at the party she engaged in three acts of oral sex with three men at $20 each.

On July 2, the defendant was indicted for knowingly transporting in interstate commerce from St. Louis, Missouri, to Washington Park, Illinois, Vivian Deering for the purpose of prostitution, debauchery and other immoral purposes, in violation of 18 U.S.C. § 2421.[1]

Upon a jury's finding of guilty, the defendant's sentence was suspended and she was placed on probation for three years. She has appealed.

1. 18 U.S.C. § 2421 provides in relevant part:

Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice;

* * * * * *

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

II

When originally enacted the Mann Act, Act of June 25, 1910, ch. 395, 36 Stat. 825, provided that it should be known and referred to as the "White-slave traffic Act." *Caminetti v. United States,* 242 U.S. 470, 489–90, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

"Congress was attempting primarily to eliminate the 'white slave' business which uses interstate and foreign commerce as a means of procuring and distributing its victims and 'to prevent panderers and procurers from compelling thousands of women and girls against their will and desire to enter and continue in a life of prostitution.' " *Mortensen v. United States,* 322 U.S. 369, 377, 64 S.Ct. 1037, 1041, 88 L.Ed. 1331 (1944).

" 'A primary purpose of the Mann Act was to protect women who were weak from men who were bad.' . . . It was in response to shocking revelations of subjugation of women too weak to resist that Congress acted." *Wyatt v. United States,* 362 U.S. 525, 530, 80 S.Ct. 901, 904, 4 L.Ed.2d 931 (1960).

The language of the Act, however, is broad in incriminating "[w]hoever knowingly transports in interstate . . . commerce . . . any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose . . . ." 18 U.S.C. § 2421. Consequently, it has been interpreted to include both commercial and non-commercial prostitution and vice, concubinage, *Caminetti, supra,* and polygamy. *Cleveland v. United States,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946).

"Whoever" includes women as putative defendants as well as "bad men." Mr. Justice Holmes thought the Act should apply to "a professional prostitute, as well able to look out for herself as was the man, [if she] should suggest and carry out a journey . . . in the hope of blackmailing the man . . ." *United States v. Holte,* 236 U.S. 140, 145, 35 S.Ct. 271, 272, 59 L.Ed. 504 (1915). The Supreme Court, however, subsequently held that the woman victim, by simply consenting to being transported in commerce for an unlawful purpose, did not violate the Mann Act nor participate in a conspiracy to violate it. *Gebardi v. United States,* 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932). Nevertheless, these cases leave no doubt that both males and females may qualify as perpetrators of the crime.

Despite these broad interpretations giving the statutory language more content than Congress may have intended, the words "for any other immoral purpose" are not without limitation. Under the *ejusdem generis* rule of statutory construction, that phrase must be confined to the same class of unlawful sexual immoralities as that to which prostitution and debauchery belong. *Cleveland, supra* 329 U.S. at 18, 25, 67 S.Ct. 13.

"Accordingly, it has been held that the transportation denounced must have for its object or be a means of effecting or facilitating the sexual intercourse of the participants. If the purpose of the journey is not sexual intercourse, though that be contemplated, the statute is not violated." *Hansen v. Haff,* 291 U.S. 559, 563, 54 S.Ct. 494, 495, 78 L.Ed. 968 (1934).

"An intention that the women or girls shall engage in the conduct outlawed by [18 U.S.C. § 2421] . . . must be found to exist before the conclusion of the interstate journey and must be the dominant motive of such interstate movement. And the transportation must be designed to bring about such result. Without that necessary intention and motivation, immoral conduct during or following the journey is insufficient to subject the transporter to the penalties of the Act." *Mortensen, supra* 322 U.S. at 374, 64 S.Ct. at 1040. *Hawkins v. United States,* 358 U.S. 74, 79–80, n.6, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958).

As distasteful as this case may have been to the jury, there is insufficient evidence of a Mann Act violation and the grossness of what occurred does not supply the missing necessary elements.

Schreiber engaged the first group of four girls. He testified:

> We had arranged for some girls to come over to perform a strip tease act.

All four of those girls performed strip tease acts. The following question was then asked and answered:

> Q. And in case these girls didn't show up, you arranged with a Mr. Sirko to have a backup show, I take it. Is that right?
>
> A. Yes, sir.

Sirko testified that he contacted the defendant and Vivian Deering. In talking to defendant on the telephone, he testified:

> Well, I said there was going to be a stag show in Washington Park, and that—if she was interested or not.

The following answers were given by Sirko on cross-examination:

> Q. Mr. Sirko, if I understand your testimony, you simply arranged for a backup show in case the first four strip teasers didn't arrive. Is that correct?
>
> A. Correct.
>
> * * * * * *
>
> Q. Now, in arranging this backup show, were you told to arrange for any type of sexual activity other than a strip tease, sir?
>
> A. No.
>
> Q. And was that the purpose for making the arrangements for the other two girls—for a strip tease, then?
>
> A. Yes.

Finally, Sirko described what occurred when the defendant followed his car from the restaurant to the Firemen's Hall.

> We went back to the Washington Park Firemen's Hall. I went in and the entertainment that they had previously scheduled had showed up and—we didn't need these two girls I had taken down there.

Employed to perform strip tease acts, the defendant and Deering upon arrival found that the gathering had already witnessed four strip tease acts and a public fornication. They weren't needed for any further strip acts and as deputy sheriff Hopkins testified, the seventy or more men "were glad to see them." Despite the lusty atmosphere, the defendant did not engage in any sexual intercourse. Schreiber saw her "ninety-nine percent of the time" she was at the Firemen's Hall and neither he nor the other witnesses saw her engage in any sexual intercourse. Of the first group of four girls, only one engaged in intercourse.

■ There was no express employment arranged that the defendant or Deering were to engage in intercourse but instead they were hired to perform strip tease acts. Webster's Third New International Dictionary defines a "strip tease" as "a burlesque act in which a female performer removes her clothing piece by piece in view of the audience." A strip tease act is not prostitution or debauchery or other immoral act within the meaning of the Mann Act. *See generally Nunnally v. United States,* 291 F.2d 205 (5th Cir. 1961). Inasmuch as only two of the six women hired as strippers eventually engaged in sexual intercourse, it can not be implied that all the strippers hired were available as prostitutes. Nor can any necessary sexual implication be drawn from Sirko's reference to a "stag show." Webster's Dictionary defines "stag" as "restricted to men; for men only; intended or suitable for a gathering of men only." All of these meanings of stag are consistent with the employment of the defendant and Deering as strip tease artists.

Consequently, there is no evidence that when the defendant drove Deering from Missouri to Illinois in order to meet Sirko at the restaurant, the defendant did so knowing that the strip acts would be preempted by a rival group of artists, and that Deering would substitute sexual entertainment for that which she had been hired to perform, namely stripping. As this court said in *United States v. Tobin,* 426 F.2d 1279 (7th Cir. 1970), "[t]he mere fact that she did engage in

prostitution upon her arrival . . . is not sufficient." *Id.* at 1282.

We reverse the judgment of conviction for lack of evidence that the transportation occurred "knowingly . . . for the purpose of prostitution or debauchery, or for any other immoral purpose . . . ." 18 U.S.C. § 2421.[2]

III

The defendant has also sought reversal (1) for the refusal of the district court to grant defendant's motion to waive a jury trial and (2) on the ground that 18 U.S.C. § 2421 is unconstitutional in discriminating between women victims and male victims. In view of our reversal, we need not consider these additional grounds.

Judgment of conviction is reversed.

2. The evidence of transportation was not too strong either. Deering testified that the defendant drove her from the defendant's home in Missouri to Illinois, but there was much other evidence that the defendant lived in Illinois. Deering at one time told the FBI that the Missouri telephone number that Sirko had used was Deering's, not defendant's, number. Finally, Deering told the FBI at different times (1) that she had hitchhiked to Illinois and (2) that a man had brought her over and (3) that two men had brought her over the state line.